Jacob Markowitz, J.
On September 9, 1966, a preliminary hearing was held by this court on petitioners’ application to be appointed the temporary legal representatives of their mother, for the .specific and limited purpose of executing a consent in her behalf to a transmalleolar amputation of her right ankle and foot.
As a result of such preliminary hearing, the court appointed a. guardian ad litem for the respondent, Sadie Nemser, and sub *617 sequently requested an eminent psychiatrist to examine her for the purpose of obtaining competent medical opinion as to her capacity to execute a consent in the form required by the hospital and the attending physicians. In addition, petitioners were directed to join both the hospital and the physician (or physicians) in charge of the care of-Mrs. Nemser as parties-respondents, so that all proper parties to this proceeding would be before the court on the continued and subsequent hearings.
As indicated in the court’s prior memorandum decision of September 9 (Matter of Nemser, N. Y. L. J., Sept. 14,1966, p. 16, col. 4), petitioners are two of three sons of respondent, Sadie Nemser. A third son, a practicing physician in the City of New York, has refused to consent to the surgical procedure recommended by his mother’s attending physicians but, while duly served with the moving papers, he did not appear in court on the return day of the motion, either personally or by counsel, to state his reason for such refusal. At the continued hearing on September 13,1966, however, he did appear before the court, pro se, and, together with each of his brothers, was afforded an opportunity to set forth fully his position with regard to the instant application.
It appears from the papers before the court that Mrs. Nemser, a widow, 80 years of age, had been a resident of the Jewish Home and Hospital for the Aged in this city from May, 1964 to August 22, 1966. She has a history of arteriosclerotic heart disease, has suffered at least three strokes and an equal number of attacks of pneumonia. On August 22, in a medical emergency, she was moved and admitted to Beth Israel Hospital, where she has since then continuously remained. Her physical condition, in substance, was diagnosed as 1 ‘ diabetic and arteriosclerotic gangrene * * * with infection; * * * extensive gangrene of the right foot and heel with infla.Tnma.tnry reaction about both areas”. While recommending an abovelcnee amputation, in view of their patient’s general condition, the attending physicians of Beth Israel Hospital suggested Mrs. Nemser undergo a transmalleolar amputation (above the ankle). It appears, however, that if the present local infection extends any higher in the front to the leg, it will militate against the transmalleolar procedure. Moreover, Dr. George Lowen, under whose care Mrs. Nemser was admitted to the hospital, has expressed the opinion that “If delay ensues, further physical deterioration will surely occur * * *. If the deterioration is allowed to progress, death will follow.” In a supplemental affidavit, dated September 12, 1966, Dr. Lowen still maintains that “ The recommended operation is distinctly a matter of the *618 difference between life and death for Mrs. Nemser.” However, as more fully discussed hereinafter, Dr. Lowen’s prognosis as to the urgency and immediate necessity of the recommended surgical procedure is not supported by any of the other competent medical evidence and opinion before the court.
In view of the fact that an attending psychiatrist of the staff of Beth Israel Hospital, after an examination of Mrs. Nemser, reported that she ‘ ‘ is not capable of understanding the nature of any permit for surgery that she might be asked to sign ”, neither the hospital nor the surgeon will proceed with the recommended operation unless consent thereto is obtained from their patient’s next of kin. Upon the physician-son’s refusal to consent, as above noted, these legal proceedings were then instituted by petitioners.
It is noteworthy, as the court has stated in its prior memorandum decision {supra), that Beth Israel Hospital’s staff psychiatrist does not categorically state that Mrs. Nemser is mentally incompetent for all purposes. Bather, as noted, he limits his opinion to the belief that she is not competent to consent to the operation which is advised by her attending surgeon.
Both Bichard G. Green, Esq., the guardian ad litem, and Dr. Abraham N. Franzblau, the court-designated psychiatrist, after painstaking investigation and thorough examination, have submitted detailed reports to the court. Both conclude that Mrs. Nemser is not capable of making for herself an informed judgment of whether the subject operation should be performed. Both, however, recommend that under the circumstances recited in their respective reports, intervention by the court is not warranted.
Dr. Franzblau, after setting forth the facts concerning Mrs. Nemser’s advanced age, her medical history and present physical condition, indicates that he has spoken with Drs. Friedman and Schwartz, Mrs. Nemser’s two medical consultants, with the patient herself, her two sons (one of the petitioners and respondent Dr. Harold S. Nemser) and with the court-appointed guardian. Dr. Franzblau’s report succinctly states:
“ 1. Some difference of opinion exists as to:
a) whether the proposed operation is essential to prolong or save Mrs. Nemser’s life;
b) the prognosis if it is done or, on the other hand, not done ; and
c) whether the patient’s mental status is such that she can understand the proposed procedure, and the significance of any consent that she might give.
*619 “ 2. Both of Mrs. Neraser’s sons whom I interviewed appear to be motivated by love for their mother and a wish to see her life prolonged, free of pain and discomfort. Norman, the lawyer is influenced by the opinions of the medical consultants who he has brought in that a transmalleolar amputation would arrest the spread of the infection and gangrene, and prolong his mother’s life. Harold, the physician, is doubtful of his mother’s ability to tolerate anesthesia and surgery, and hopes that, treated conservatively and kept * clean ’, the gangrenous parts would slough off through auto-amputation. The disagreement between the brothers appears to be further clouded by long-standing familial differences over the support and management of their mother, and over the question of the adequacy of her medical care up to the present episode.
‘ ‘ 3. There appears to be no disagreement among Drs. Friedman and Schwartz, that:
a) The recommended procedure as proposed is not a lifesaving measure, nor is it a medical emergency.
b) Its effectiveness is by no means assured.
c) The same condition may recur in the stump, after surgery, since such wounds heal notoriously poorly in diabetics.
d) there is no likelihood of ever applying a prosthesis or achieving ambulation in this patient.
e) there is very little possibility of proceeding ultimately to do the mid-thigh amputation, which is considered as a second and ultimately beneficial stage, in such cases.
‘1 4. The patient is clearly unable to understand the situation or to render informed consent. (I agree completely with the opinion of Dr. Weiss as to her mental status.) However, she is aware of her bodily integrity and wants no amputation of any part of her. She wants both to live and to retain her limb, and is not clearly aware of the conflict implicit in these alternatives. Pressed to make a decision, she would be willing to leave it to the doctors, but she would not do so with clear mind or perception. Her consciousness of pain is mercifully diminished by the partial oblivion which has intervened in her condition.
‘ ‘ Accordingly, I do not believe that intervention on the part of the Court is indicated.”
In substance, the perceptive and detailed report of Mr. Green is the same and, as above noted, terminates in a similar conclusion.
Thus, it becomes apparent that this proceeding, where responsible members of a family, including a physician-son, unfortunately cannot agree on what is medically necessary or proper for their aged and infirm mother, presents an example *620 of a grave dilemma which confronts those who engage in the healing arts and, on the other hand, some basic and fundamental issues on the nature and scope of judicial power and the wisdom or propriety of judicial intervention. (See Application of President & Directors of Georgetown College, 331 F. 2d 1010, 1015.)
There can be no doubt at all that the court, Mrs. Nemser’s children, and the doctors are most desirous of prolonging the life of Mrs. Nemser without undue pain and suffering. The sympathetic feelings of the court, however, are, by themselves, hardly enough to clothe it with the right to authorize the surgical procedure or to entertain favorably the within application, particularly in light of the recommendations of the guardian ad litem, the report and conclusion of the court-designated psychiatrist and his noted medical opinions of Drs. Friedman and Schwartz. The court cannot overlook the fact that petitioners rely solely on the opinion and prognosis of one physician, whose “ life and death ” position is neither supported nor corroborated by any of the other medical evidence in the record.' Moreover, regardless of their personal differences, I am certain petitioners will agree that their physioian-brother-respondent Dr. Harold S. Nemser has the best interests of their mother at heart. It is, therefore, most significant to note that Dr. Nemser categorically stated in open court he believed “ assaultive surgery in a terminal case in the name of emergency is cruelty beyond description ”. He pointed out that while his mother is “foggy” at times, she is, nevertheless, aware of her body and does not want her foot amputated. Dr. Nemser stressed the fact that the recommended operation is not curative, nor is it a matter of life or death, as suggested by Dr. Lowen alone. Significantly, Drs. Friedman and Schwartz concur in the opinion that the suggested operation, because of Mrs. Nemser’s diabetic condition, will not heal. On the contrary, it appears that such surgical procedure may open new areas of infection.
D.r. Nemser also pointed out to the court that his mother’s condition, without the operation, had vastly improved; so much so, that since September 8, 1966 (for at least the immediate five days prior to the continued hearing) she had not required any antibiotics nor was ther present any new infection. He feared that his mother’s heart condition, her past history of congestive lung failure (not caused by the gangrene) and the traumatic effect of the contemplated operation, if she survived it, would hasten her demise rather than prolong her life.
The court would not hesitate to grant the relief requested if the circumstances warranted the same. From the evidence *621 before the court, however, I must conclude that the relief sought is inappropriate at this time. It must be borne in mind that we are not concerned with a person who has been judicially declared incompetent, nor are we here dealing with an infant, who, by specific enunciated public policy, as evidenced by many applicable laws, may always be treated as a ward of the court, and thereby entitled to its judicial protection. Despite their allegation that their mother is incompetent, it clearly appears that this is not the true basis or purpose of the pending application. While the law provides adequate means for the appointment of a committee of an incompetent (see Mental Hygiene Law, §§ 100-113), in lieu of seeking such designation and the attendant duties and responsibilities to care for the interests and welfare of their then ward, petitioners seek only the limited designation and approval of the court which, in effect, will authorize specific surgical treatment.
In my opinion, even with the involvement of the hospital and physicians, now parties-respondents to this proceeding, there is serious doubt here as to the existence of a truly justiciable legal controversy, despite the claimed vital factor of a human life hanging in the balance. However, as stated in the prior memorandum-decision (supra), in no way does the court intend to imply that an individual must be judicially declared incompetent before it will or may intervene in his or her behalf. Thus, as parens patries, guardian of persons under disability, the court appointed a guardian ad litem and designated a psychiatrist to examine Mrs. Nemser, and must now give due consideration to and be guided by their reports and recommendations. (See Sengstack v. Sengstack, 4 N Y 2d 502, 509 et seq.)
Actually, it is apparent that this proceeding was necessitated only because of the current practice of members of the medical profession and their associated hospitals of shifting the burden of their responsibilities to the courts, to determine, in effect, whether doctors should proceed with certain medical procedures definitively found necessary or deemed advisable for the health, welfare, and perhaps even the life of a patient who is either unwilling or unable to consent thereto. Thus, petitioners upon the hearing, indicated their concern that if the pending application were to be denied at this time, their mother’s attending physicians and the respondent hospital, in the absence of written consent by the next of kin or prior judicial approval, would still refuse necessary surgical treatment if a sudden reversal of her present improved condition mandated it as a real “life or death” solution.
*622 It seems incongruous in light of the physicians’ oath that they even seek legal immunity prior to action necessary to sustain life. As the court has had previous occasion to note, how legalistic minded our society has become, and what an ultra-legalistic maze we have created to the extent that society and the individual have become enmeshed and paralyzed by its unrealistic entaglements. (See Matter of Powell v. Columbia Presbyterian Med. Center, 49 Misc 2d 215, 216.) Certainly, if medical procedures are of an emergency nature or are required suddenly to save the life of a human being, neither a physician nor a hospital should be deterred from the exercise of sound medical judgment with respect to necessary treatment merely by threat of possible legal action. Emergency requirements, if, in fact, they are such, should not be delayed nor the responsibility therefor shirked while fearful physicians and hospitals first seek judicial sanction for a determination which, at the end, must, in any event, be a medical decision rather than a legal one.
The history and triumphs of medicine are replete with the names of “medical giants” whose experimentations, medical procedures, techniques, miracle drugs and other discoveries became a boon to humanity. Men and women such as Semmelweis, Jenner, Curie, Sanger, Salk, "Walter Reed, Lister, Pasteur and Wasserman would not be deterred by the mere fear of possible legal consequences of their acts. Many of them risked martyrdom to perpetuate the principles and ideals of the Hippocratic oath. Today, however, “ Good Samaritan ” statutes, such as that recently enacted in New York, seemingly are deemed necessary by many physicians before they will render medical treatment. These laws are not to be regarded as a symbol of the medical profession’s dedication to service “when and where needed”. On the contrary, in my opinion, these laws are a blot upon the escutcheon of an honored profession and stand as a monument to the present-day physician’s reluctance or refusal to give medical assistance, even in emergency situations, without the firm assurance that he is immune from the consequences of fulfilling his moral obligations as a doctor. There can be little doubt that even without such legislative safeguards, a court would be and should be loath to hold any physician legally responsible for any consequences flowing from sudden, emergency-required competent medical treatment or experimentation.
However, from the frequently recurring applications to the courts in instances similar to the case at bar, it is evident that in the absence of protective legislation, members of the medical *623 profession, by their repeated insistence upon a written release in any and all cases prior to operative procedures, in effect, compel judicial intervention in matters when the necessity or value of a legal opinion alone is highly questionable. Confronted by a situation such as this, I am of the opinion that the time has come for courts to inquire where a continued condonation of such action and where a continued assumption of jurisdiction over such matters lead. Undoubtedly, physicians, surgeons and hospitals, like judges, lawyers and others as well, are often faced with seemingly irreconcilable demands and conflicting pressures. Philosophers and theologians have pondered these problems and, as is to be expected, different groups evolved different solutions. Religious beliefs and doctrines, for example, complicated equitable solutions sought by courts in blood transfusion cases (see Matter of Powell, supra). Various other problems, as noted in the Georgetown College case (supra, p. 1017), also readily come to mind: for example, a crisis in childbirth may require someone to decide whether the life of the mother or the child shall be sacrificed; absent a timely and decisive choice, both may die. May the physician or hospital require the courts to decide?
The instant proceeding is another example.
Here, we have the consent of two of the three responsible members of the immediate family of the hospitalized patient, yet, without judicial approbation the doctors and hospital refu.se to go forward with recommended surgical treatment; this, despite the fact that at least one of the attending physicans (Dr. Lowen) believes that if his patient’s condition deteriorates, death will ultimately result. Should this or similar emergency conditions actually arise, are the courts prepared to continue to condone the medical practice of requiring written consent or judicial approval first, or is it time that hospitals and physicians are compelled to shoulder this responsibility of making a medical decision? If there were 5, 10 or more children or members of a patient’s family, will the hospital and physician wait to perform a needed operation which they are morally obligated to perform until and unless all consent thereto ? Is the court to be made the arbiter in all family disputes as to the wisdom or necessity of medical treatment, or is that, in reality a medical problem to be resolved by the physician, his patient, where possible, and the family, if necessary?
Certainly, the courtroom is not the proper forum nor is a legal proceeding the best method for a determination as to whether a physician should proceed to assist, cure or ameliorate a serious physical condition which, while perhaps stable at the moment, *624 as here, might suddenly erupt and become a medical emergency. Perhaps the time will come when society, by appropriate legislative enunciation, will make elderly people, like infants, wards of the court, subject to its determinations as to their best interests and welfare. Until such time, however, by the very nature of the services they are called upon to render, physicians, like judges and lawyers, should be and must be prepared to perform the necessary acts and the moral duties attendant to their chosen profession, regardless of any potential, undesired or unpopular consequences and the results arising therefrom. If a medical emergency exists, let the physician act as he alone knows he must and should act: If there is no such emergency or urgency, then the court should not, in effect, be placed in the position of making what should be a private or family determination— a medical decision, obviously not a legal one.
It is regrettable that the court here is placed in the position of refusing, or what to many may seem the refusal, to act in order to save a life or to ameliorate suffering. The contrary is the fact. It is because of the court’s deep concern for Mrs. Nemser’s life and well-being that it is reminding those whose responsibility it actually is, to act appropriately, not arbitrarily, and without fear. The court, likewise, is not unmindful that whatever course is followed by those persons who are ultimately responsible here, it may prove fatal. Similarly, the court is aware that on occasions where other agencies of government or society fail to act, it must intervene for the common good. However, as aptly stated by Judge Cabdozo in The Nature of the Judicial Process [Selected Writings, Cardozo, Edited by Hall, pp. 164 — 165]: “ The judge, even when he is free, is still not wholly free. He is not to innovate at pleasure. He is not a knight-errant, roaming at will in pursuit of his own ideal of beauty or of goodness. He is to draw his inspiration from consecrated principles. He is not to yield to spasmodic sentiment, to vague and unregulated benevolence. He is to exercise a discretion informed by tradition, methodized by analogy, disciplined by system, and subordinated to 1 the primordial necessity of order in the social life.’ Wide enough in all conscience is the field of discretion that remains.” (Emphasis added.) It seems advisable that an appropriate study should be made by members of the legal and medical professions, hospital personnel, and the community in general, including its spiritual advisers, to consider problems akin to those raised by this application. Certainly the social aspects of such problems far outweigh their legal implications. *625 Thus, while I have the greatest sympathy and respect for the petitioners and the position they have advocated here, in view of the foregoing, and particularly inasmuch as neither the present physical condition of Mrs. Nemser nor competent medical opinion dictates the course of action which ultimately would result from the relief sought by petitioners, I am constrained to hold that the application to be appointed her temporary legal representatives for the specific and limited purpose of executing a consent to a transmalleolar amputation is denied and the petition is dismissed.
The court would be remiss if it failed to acknowledge publicly its gratitude for the services and invaluable assistance rendered by the guardian ad litem and the court-designated psychiatrist. Mr. Green’s and Dr. Franzblau’s unstinting and unselfish devotion to their assigned tasks, on short notice by the court, is worthy of the highest commendation. The court recognizes that their services were performed at great personal sacrifice.