148 N.J. Super. 168 (1977)
372 A.2d 360
IN THE MATTER OF WILLIAM SCHILLER.
Superior Court of New Jersey, Chancery Division.
Decided February 4, 1977.
*171 Mr. Irving Lloyd Gang, attorney for William Schiller.
Mr. Alexander P. Waugh, Jr., attorney for East Orange General Hospital (Messrs. Riker, Danzig, Scherer & Debevoise, attorneys).
DWYER, J.S.C.
Application for the appointment of a "special guardian" to consent to the amputation of the right leg of William Schiller, who is a widower and 67 years of age, to prevent the spread of infection from gangrenous area of the right foot is before the court for decision on the adjourned date of the return date for the original order to show cause addressed to Schiller. East Orange General Hospital, a nonprofit New Jersey corporation, filed the complaint and sought the original order to show cause on the morning of Friday, January 28, 1977, supported by affidavits of a surgeon that the condition presented a threat to the life of Schiller and a psychiatrist that Schiller was mentally incapable of giving consent to the operation. The supporting papers also showed that Schiller had been admitted through the emergency room and not by a private physician. The verified complaint asked that either the assistant administrator of the hospital or a cousin, if he would consent to serve, be appointed. It further stated that the hospital had located *172 an aunt but she did not want to become involved. There is no provision in the rules of court pertaining to the right to appoint a special guardian or the procedure to be followed.
The court granted the order to show cause, relying upon Barnert Memorial Hosp. Ass'n v. Young, 63 N.J. 578 (1972) (court affirmed trial court appointing a sister of patient as special guardian to consent to amputation of left leg of adult woman whom the trial judge found to be mentally incompetent to consent), and John F. Kennedy Memorial Hosp. v. Heston, 58 N.J. 576 (1971). The return date was fixed for Monday, January 31, 1977, on the representation of counsel for the hospital that Schiller's condition was believed to be stable and Schiller's cousin was then out of the State but would be available on Monday.
Except for Barnert Memorial Hosp. Ass'n v. Young, supra, wherein the Supreme Court limited its comments to approval of the action taken on the unreported oral opinion of the trial judge, this court has found no New Jersey case which has considered the questions of whether a court may appoint a special guardian to consent to surgery, what the rights of the respective parties are, and how the court should measure and protect those rights if it acts. The foregoing are considered in the order stated.

I. AUTHORITY
The rules do not contain any specific guidelines as to how to proceed where the basic question is capacity of patient to consent to, or to refuse, treatment, either in a case in which the threat to life is so great that death will ensue within hours in the absence of treatment, or in a case in which there is a life threatening condition with time for deliberation. R. 4:83-1 et seq. applies where a guardian is sought for a person who is mentally incompetent to manage himself or herself and his or her property, and it has support in the statutes, N.J.S.A. 3A:6-35 et seq. Such a guardian must be willing to undertake the management of the ward's property *173 and see that the ward is thereafter properly cared for. N.J.S.A. 3A:6-36.
The question of the competency of a person to consent, or refuse to consent, to a medical procedure is a justiciable matter which the trier of fact must resolve, Grannum v. Berard, 70 Wash.2d 304, 422 P.2d 812, 25 A.L.R.3d 1434 (Sup. Ct. 1967); Kaplan v. Haines, 96 N.J. Super. 242 (App. Div. 1967), aff'd o.b. 51 N.J. 404 (1968), and hence presents a matter proper for a court to decide.
In a number of cases involving blood transfusions, where persons objected on religious grounds on behalf of the patient, the courts have not directly decided or adjudicated what is or is not, proper medical treatment but have decided whether or not a general or special guardian should be appointed to consent to life-saving procedures. See John F. Kennedy Memorial Hosp. v. Heston, supra, and cases cited therein and contra In re Osborne, 294 A.2d 372 (D.C. Ct. of A. 1972) (Appellate court affirmed refusal to appoint special guardian for competent male adult who refused transfusion with knowledge death would ensue and whose family supported his decision.) See particularly In re Quinlan, 70 N.J. 10, 44-51 (1976) and note the conclusion:
2. To appoint Joseph Quinlan as guardian of the person of Karen Quinlan with full power to make decisions with regard to the identity of her treating physicians.
We repeat for the sake of emphasis and clarity that upon the concurrence of the guardian and family of Karen, should the responsible attending physicians conclude that there is no reasonable possibility of Karen's ever emerging from her present comatose condition to a cognitive, sapient state and that the life-support apparatus now being administered to Karen should be discontinued, they shall consult with the hospital "Ethics Committee" or like body of the institution in which Karen is then hospitalized. If that consultative body agrees that there is no reasonable possibility of Karen's ever emerging from her present comatose condition to a cognitive, sapient state, the present life-support system may be withdrawn and said action shall be without any civil or criminal liability therefor, on the part of any participant, whether guardian, physician, hospital or others.
By the above ruling we do not intend to be understood as implying that a proceeding for judicial declaratory relief is necessarily required *174 for the implementation of comparable decisions in the field of medical practice. [70 N.J. at 55].
A guardian should not be appointed until the preliminary fact is determined, because that would be a prejudgment of the question to be decided. Compare R. 4:83-4(a).
The New York Supreme Court, in In re Petition of Memser, 51 Misc.2d 616, 273 N.Y.S.2d 624 (Sup. Ct. 1966), observed that there is a need for courts to be wary of becoming medical consultants. It is the responsibility of physicians to make medical decisions. That court there found that the patient was not generally incompetent but lacked capacity of making an informed judgment for herself of whether the operation should be performed. She was 80 years of age, had suffered three strokes and attacks of pneumonia, and had a history of diabetes and arteriosclerosis. She had gangrene of the foot. The attending doctor had recommended an amputation above the ankle. Two sons consented. The third son, a physician, refused and stated that "assaultive surgery in a terminal case in the name of emergency is cruelty beyond description." The court recognized that a patient did not have to be found mentally incompetent before a court might intervene under the parens patriae jurisdiction. But the court concluded there was doubt that there was a real legal controversy before the court, but only a difference among family members.
Actually, it is apparent that this proceeding was necessitated only because of the current practice of members of the medical profession and their associated hospitals of shifting the burden of their responsibilities to the courts, to determine, in effect, whether doctors should proceed with certain medical procedures definitively found necessary or deemed advisable for the health, welfare, and perhaps even the life of a patient who is either unwilling or unable to consent thereto. Thus, petitioners upon the hearing, indicated their concern that if the pending application were to be denied at this time, their mother's attending physicians and the respondent hospital, in the absence of written consent by the next of kin or prior judicial approval, would still refuse necessary surgical treatment if a sudden reversal of her present improved condition mandated it as a real `life or death' solution.
*175 It seems incongruous in light of the physicians' oath that they even seek legal immunity prior to action necessary to sustain life. As the Court has had previous occasion to note, how legalistic minded our society has become, and what an ultra-legalistic maze we have created to the extent that society and the individual have become enmeshed and paralyzed by its unrealistic entanglements! (See, Matter of Powell v. Columbian Medical Center, 49 Misc.2d 215, 216, 267 N.Y.S.2d 450, 451-452). Certainly, if medical procedures are of an emergency nature or are required suddenly to save the life of a human being, neither a physician nor a hospital should be deterred from the exercise of sound medical judgment with respect to necessary treatment merely by threat of possible legal action. Emergency requirements, if, in fact, they are such, should not be delayed nor the responsibility therefor shirked while fearful physicians and hospitals first seek judicial sanction for a determination which, at the end, must, in any event, be a medical decision rather than a legal one. [273 N.Y.S.2d at 629].
This case is different in that neither Schiller nor his family selected the hospital. At the time the application was filed the available members of the family had refused to get involved. Schiller had neither consented nor refused treatment.
The cases involving blood transfusions for victims of accidents or other emergent conditions, State v. Perricone, 37 N.J. 463 (1962), cert. den. 371 U.S. 890, 83 S.Ct. 189, 9 L.Ed.2d 124 (1962); Raleigh Fitkin-Paul Morgan Memorial Hosp. v. Anderson, 42 N.J. 421 (1964); John F. Kennedy Memorial Hosp. v. Heston, supra; Application of President & Directors of Georgetown College, Inc., 118 U.S. App. D.C. 80, 331 F.2d 1000 (D.C. Cir.1964), cert. den. 377 U.S. 978, 84 S.Ct. 1883, 12 L.Ed.2d 746 (1964), rearg. den. Id., 118 U.S. App. D.C. 90, 331 F.2d at 1010, but see dissent of then Judge, now Chief Justice Burger; United States v. George, 239 F. Supp. 752 (D. Conn. 1965), show that pleadings frequently may have to be oral and a record preserved by tape recording or other available means, but to the extent possible, written pleadings and court reporters should be used.[1]
*176 Under John F. Kennedy Memorial Hosp. v. Heston, supra, our Supreme Court has said that where a patient was received in a hospital under emergency conditions and there was a refusal of recommended treatment by a member of the family on behalf of a patient,
* * * hospital and its staff should not be required to decide whether the patient is or continues to be competent to make a judgment upon the subject, or whether the release tendered by the patient or a member of his family will protect them from civil responsibility. The hospital could hardly avoid the problem by compelling the removal of a dying patient, and Miss Heston's family made no effort to take her elsewhere. [58 N.J. at 582]
and hence such institutions and staff have standing to bring an action for that determination. The same rationale applies in the type of case before the court. Barnert Memorial Hosp. Ass'n v. Young, supra.
If the fact of disability, in the sense of legal status or the fact of lack of mental capacity to consent, is established, then the court is confronted with a disabled person whom the equity courts have long sought to protect, as stated in In re Quinlan, supra:
Courts in the exercise of their parens patriae responsibility to protect those under disability have sometimes implemented medical decisions and authorized their carrying out under the doctrine of "substituted judgment". Hart v. Brown, 29 Conn. Sup. 368, 289 A.2d 386, 387-88 (Super. Ct. 1972); Strunk v. Strunk, 445 S.W.2d *177 145, 147-48 (Ky. Ct. App. 1969). For as Judge Muir pointed out:
As part of the inherent power of equity, a court of equity has full and complete jurisdiction over the persons of those who labor under any legal disability. * * * The court's action in such a case is not limited by any narrow bounds, but it is empowered to stretch forth its arm in whatever direction its aid and protection may be needed. While this is indeed a special exercise of equity jurisdiction, it is beyond question that by virtue thereof the court may pass upon purely personal rights. [137 N.J. Super. 227 at 254 (quoting from Am. Jur.2d, Equity § 69 (1966))]. [70 N.J. at 44-45]
If either of the fact determinations outlined above are affirmatively found, a court has power to appoint a "special guardian" under the parens patriae jurisdiction.
In acting pursuant to that jurisdiction courts should be careful, particularly in nonemergent cases involving children, in appointing a special guardian with power to consent to surgery. See In Matter of Weberlist, 79 Misc.2d 753, 360 N.Y.S.2d 783 (Sup. Ct. 1974) (court appointed special guardian for a mentally retarded child, abandoned by parents who lived in state institution, to do corrective surgery but only after being satisfied procedure was not experimental, reasonably safe and benefit to child substantial.)
The court suggests that guidance from the Legislature is desirable. See N.J.S.A. 3A:6-26 authorizing a surrogate to act as special guardian for minors over 14 years of age without parents to consent to enlistments in armed forces.

II. RIGHTS OF THE PARTIES
Our Supreme Court has stated what the rights of the respective parties are, in respect to disabled persons in the context of the blood transfusion cases and religious issues, under the New Jersey Constitution and its interpretation of the Constitution of the United States. There emphasis was placed on the interest in preserving life. In In re Quinlan, supra, our Supreme Court recognized the need to consider the right of privacy and the right of a guardian to make decisions for the ward.
*178 It is implicit in those cases, and the record in the trial court in Barnert Memorial Hosp. v. Young, supra, that notice and an opportunity to be heard commensurate with the circumstances must be afforded to protect the right to due process of law guaranteed under the Fourteenth Amendment of the United States Constitution and N.J. Const. (1947), Art. I, par. 1.
There is the common law right of each competent adult person to decide for herself or himself what treatment is proper. In Bennan v. Parsonnet, 83 N.J.L. 20 (Sup. Ct. 1912), the rule is stated:
The patient must be the final arbiter as to whether he shall take his chances with the operation or take his chances of living without it. Such is the natural right of the individual which the law recognizes as a legal right. Consent therefore of an individual must be either expressly or impliedly given before a surgeon may have the right to operate. [at 22-23, citations omitted]
The Supreme Court there reversed the trial judge's submitting the question of consent to the jury. It held that where a surgeon, selected by the patient to perform an operation for a hernia on the left side, in the course of the operation and while the patient was under anesthesia, discovered a critical hernia on the right side, the surgeon had the implied consent of patient to do what was needed to reduce risk to life. The surgeon had to make a medical judgment for the good of the patient. The patient having selected the surgeon to render the type of treatment being rendered, there was implied authority to act when the emergency developed.
In the emergency room cases and the one before the court, the patient has not in the same sense selected the surgeon. There is the added problem that the surgeon has grounds for believing the patient lacks capacity to consent.[2]
*179 The right of the individual, then, is to have a determination that he or she can make the determination and, if not, to have some competent able person to make it in the best interests of the person.
If there is prima facie evidence of general mental incompetency, if there is time, and particularly if there is some member of the family who will act as a guardian, the court should proceed under R. 4:83-1 to have a general guardian appointed.[3] See Warker v. Warker, 106 N.J. Eq. 499 (Ch. 1930), aff'd 109 N.J. Eq. 106 (E. & A. 1930) (where parties wanted to settle case but plaintiff was an old lady who, in bringing action, had sought to recover property conveyed to a cousin without consideration; Chancery Court refused dismissal of action pending proceeding to determine competency. Until determination of incompetency or disability, the court could not act under parens patriae jurisdiction). The general guardian may then seek independent medical advice as to whether the surgical procedure is necessary if the guardian thinks that there is any question.
N.J.S.A. 3A:6-35 provides that the issue of mental competency shall be tried without a jury unless the alleged *180 incompetent demands one. This is set forth in R. 4:83-4(a). Where the question of the capacity of a person, otherwise competent, to consent arises in civil litigation, there is a right to trial by jury. See Grannum v. Berard, and Kaplan v. Haines, supra. The right is not lost because the action is one for declaratory relief. N.J.S.A. 2A:16-58 (issues of fact to be tried by jury where demanded).
If an R. 4:83-1 procedure for a general guardian cannot be followed[4] and there is no evidence of disability in the sense of legal status, the question then is, what is the patient's mental capacity to determine for himself or herself to consent or refuse consent?
The mental capacity to give consent to a surgical procedure is the same as that required to enter into a contract. In 17 C.J.S. Contracts § 133(1) it is stated:
The test of mental capacity to contract is whether the person in question possesses sufficient mind to understand, in a reasonable manner, the nature, extent, character, and effect of the act or transaction in which he is engaged; the law does not gauge contractual capacity by the standard of mental capacity possessed by reasonably prudent men. It is not necessary to show that a person was incompetent to transact any kind of business, but to invalidate his contract it is sufficient to show that he was mentally incompetent to deal with the particular contract in issue, * * *.
In terms of mental capacity to consent, the test may be stated as: Does the patient have sufficient mind to *181 reasonably understand the condition, the nature and effect of the proposed treatment, attendant risks in pursuing the treatment, and not pursuing the treatment? See Grannum v. Berard, and Kaplan v. Haines, supra.
Under R. 4:83-4(a), where there is an application for a guardian the court has authority to appoint an attorney for an alleged incompetent. This court believes, by analogy, that is sufficient basis of authority to appoint an attorney if one is not present and the patient wants one. Even if the patient does not want one and there is time, the court should carefully consider whether one should not be appointed anyway to see that the patient's rights are protected. As stated by Justice Brandeis in his dissenting opinion in Olmsted v. United States, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928), one of the basic rights of individuals is to be left alone and to be protected from government act.

III. PROCEDURE
As stated at the beginning of this opinion, the matter came before the court for decision on the adjourned date of the return date of the original order to show cause which gave time for some deliberation and research.
On the afternoon of Friday, January 28, 1977, the day the original order to show cause was signed, counsel for the hospital advised the court by telephone that the surgeon had decided the situation had changed and the doctors felt that they should operate immediately.
With the courtroom reporter the court went to the hospital to talk to Schiller, the doctors and counsel for the hospital.
Schiller told the court in response to questions that he had lived alone for several years and was on Social Security; that except for a friend in the building where he had a room, he was estranged from his family and friends, but a cousin had come to see him in the hospital, and that he had had *182 no real problems before he came to the hospital. His friend was unable to care for him and had called the ambulance.
The surgeon who had been on duty on January 6, 1977, the day Schiller was admitted to the hospital, described his condition at that time from the record as being covered with some of his own excrement, disheveled and, with respect to the right foot, stated that it
* * * was extremely foul smelling and putrid, grotesque, overt gangrene, first three toes were swollen with purulent discharge, and pieces of sock material adherent, little pieces of tissue freely dislodged on cleaning. Clinically, the diagnosis was gangrene.
The condition, in his opinion, had developed over months. The conclusions included diagnosis of diabetes mellitus, infection and anemia.
The surgeon stated that the infection was treated with antibiotics. A medical doctor prescribed the treatment for the diabetes and anemia. He said that by January 9 the diabetes was under control. On that date he talked to Schiller about his condition and the need to amputate the right leg to prevent the spread of the infection. Schiller stated on that and several subsequent occasions that he wanted to think about the matter.
The surgeon stated that there was evidence of a spreading of the infection. He then asked a psychiatrist to examine Schiller as to his mental capacity. The psychiatrist, who had examined Schiller on two prior occasions and was present while the surgeon demonstrated the leg to Schiller and what was happening to it, stated that Schiller had organic brain damage, probably caused by arteriosclerosis or by excessive use of alcohol over a prolonged period of time, or both. He further stated that Schiller did not comprehend the amputation as a life-saving technique. He further stated that in his opinion Schiller did not have the mental capacity to knowingly consent or refuse to consent.
Schiller did not ask any questions but responded to questions put to him. Depending upon the question put to *183 him Schiller responded that he did not want the operation; he just wanted to be left alone and die; he wanted to continue to receive care, and if there were a place where he could go and be taken care of, he was interested in living.
After questioning the surgeon as to the status of the infection and speed of spread, the court was assured by the surgeon that at the moment the antibiotics had stabilized the condition. He also explained that Schiller's condition differed from gangrene of the foot in a nondiabetic caused by frostbite or other sudden event. In such cases the tissue in the area beyond the gangrenous area is good, the circulation is good, and the oxygen supply is good. Frequently a wall is formed between the areas. If no infection develops in the area of the adjacent tissue, there may be self-amputation of the gangrenous area when it completely dies. In the case of Schiller, he was a diabetic. He has an infection in the adjacent area which was slowed, but not stopped, by the use of antibiotics. Diabetics generally have problems associated with the circulatory system and their resistance to infection tends to be low. The danger is that the gangrenous area will generate toxic material that will spread to other parts of the body and cause death. The amputation of the leg above the knee would provide an area where a stump may be formed from good tissue if the amputation is done in time. If the surgery is delayed, either the infection will spread to a point where the whole leg will have to be removed under conditions that expose the patient to a high degree of risk or toxic material will cause death. Based on the surgeon's statement that, after reviewing the chart and the results of the latest culture tests, there was not at that moment an immediate danger to life in the sense that Schiller would expire in a matter of hours but, in the absence of a change, a few days delay would not change the situation.
The court asked Schiller if he wanted an attorney. He said he could not afford one. If the court found an attorney to serve and appointed him, Schiller indicated he would *184 confer with him. The court appointed Irving Lloyd Gang, Esq. The court also appointed an independent psychiatrist to examine Schiller and report to the court. Subsequently, the court learned from the trial record in Barnert Memorial Hosp. Association v. Young, supra, that the trial judge there made similar appointments.
In a proceeding for the appointment of a general guardian, R. 4:83-4(a) authorizes the compensation for the attorney to be fixed by the court and paid either by the estate of the incompetent or the parties to the action. In this case, as well as in the Barnert Memorial Hosp. Ass'n v. Young case, supra, the attorney volunteered his services to assist the court because of the limited resources of the patient.
Although New Jersey has not adopted Evid. R. 59 and 60 for the appointment of independent experts, the Supreme Court has provided for the appointment of impartial medical experts from a panel selected by the Supreme Court and available through the office of the Administrative Director of the Courts in personal injury actions and wrongful death cases. R. 4:20-1. The court construed this as sufficient authority to appoint an independent psychiatrist, where one of the problems was a potential personal injury action or wrongful death case. The appointment was not made from that source.
The court concluded that the appointment of an independent psychiatrist was desirable because of the association of the hospital's psychiatrist with its staff and the surgeon. Hospital's counsel urged the appointment of an independent expert. Compensation for this psychiatrist will be provided for by the parties.[5]
Since Schiller was unable to read, which both psychiatrists attributed to the organic brain damage, his attorney orally advised him of his right to a jury trial in the presence *185 of a nurse. Schiller responded that he wanted to think about it. The attorney filed an Answer stating Schiller did not want the operation and did not consent.
The court concluded that there was not a demand for a jury trial. Notice was given to the known relatives. Rev. Francis E. Schiller, a Catholic priest, who was a cousin, was present with counsel.
Schiller was not present at the hearing in the courtroom on Friday, February 4, 1977. Because of his infection and the danger of other infections to his life, he was kept isolated in the hospital. His first three toes protruding through a sterile dressing were black. His foot to his ankle was swollen. His ankle was red in color and the lower portion of his leg swollen. His entire right leg flexed against his abdomen.
At the hearing the two psychiatrists testified that Schiller was incapable of understanding his present condition, the amputation as a life-saving technique, and of either consenting to or refusing to consent to the amputation.
The independent psychiatrist testified that Schiller evidenced the five tests for organic brain damage, was disorientated as to time and place, and in reality did not understand who was talking to him. He further testified that in his opinion Schiller was mentally incompetent to manage himself or his affairs. Schiller could not do the simplest addition or subtraction. He explained his answers as instantaneous responses which were not based on any judgment or insight because he lacked the capacity for insight or judgment.
The treating medical doctor stated that the diabetes was under control.
The surgeon testified as earlier stated and added that there was continuing evidence of deterioration of tissue, with probable spread of infection. He also testified that a surgical consultation was held on Thursday, January 27, 1977, and the report filed on January 28, 1977 stating *186 that the amputation should be done at once. He expressed the opinion that Schiller would survive surgery if it was performed while he was in the condition he was in at that time.
Rev. Francis E. Schiller stated that he was willing to serve as special guardian to consent. Preference is given to family members. N.J.S.A. 3A:6-36. In re Quinlan, supra.
The reason for inquiring into the medical aspects was to make sure that there was an emergency and that the prospective special guardian knew the situation and understood it.
The court entered an order appointing Rev. Francis E. Schiller special guardian with authority to consent to life-saving medical treatment, including amputation of the right leg above the knee.
NOTES
[1] The invocation of courts in those cases turned more on questions of legal status, such as a child, where the facts as to status and hence legal disability were not in dispute. Even in the John F. Kennedy Memorial Hosp. v. Heston case, supra, the Supreme Court stated that the adult was incapable of acting because of her physical condition. In such cases this court construes the problem to be which person is to be the guardian who will act in the best interests of the patient. In In re Osborne, supra, the court determined that there was neither disability nor any prima facie showing of incapacity. The court emphasizes only the difference between a situation where the disability is apparent on undisputed facts concerning status and unestablished facts concerning mental incompetency. Where the facts are undisputed, a court may proceed more speedily within the traditional guidelines of the parens patriae jurisdiction discussed hereafter.
[2] In accident cases, where immediate treatment is necessary and the person is unconscious or delirious, it is said that there is implied consent to the treatment. 1 Harper and James, The Law of Torts (1956), § 3.10 at 235. This concept is reflected in N.J.S.A. 2A:62A-1, which provides:

Any individual, including a person licensed to practice any method of treatment of human ailments, disease, pain, injury, deformity, mental or physical condition, or licensed to render services ancillary thereto, who in good faith renders emergency care at the scene of an accident or emergency to the victim or victims thereof, shall not be liable for any civil damages as a result of any acts or omissions by such person in rendering the emergency care.
[3] Unfortunately, in many cases today involving older persons there is no apparent family and there is a substantial question as to who in such circumstances may make an application. The complainant must be a relative, creditor, or perhaps have a relationship founded upon contract, trust or confidence but a stranger may not. In re Oswald, infra; 6 N.J. Practice (Clapp, Wills and Administration) (3 ed. 1962), § 747. The Legislature should consider the problem.
[4] In the absence of a proper plaintiff and supporting affidavits, a court has no inherent power to determine mental incompetency. Its jurisdiction in such matters is purely statutory and hence a court has no inherent power to expand it. In re Oswald, 132 N.J. Eq. 325 (Ch. 1942). Although R. 4:83-6, consistent with N.J.S.A. 3A:6-35 and N.J. Const. (1947), Art. I, par. 9 permits a trial of mental competency without a jury, and there is no right to a jury trial on such issue under the Constitution of the United States, Ward v. Booth, 197 F.2d 963, 33 A.L.R.2d 1134 (9 Cir.1952), if the alleged incompetent demands a jury trial, R. 4:83-6 requires that the matter be tried by jury. R. 4:83-6 differs from the provisions of the rules in effect when In Matter of A.L.S., 1 N.J. Super. 473 (Ch. Div. 1948), was decided.
[5] Subsequent to this decision, proceedings for the appointment of a general guardian for Schiller were commenced.