152 N.J. Super. 298 (1977)
377 A.2d 969
IN THE MATTER OF W.S., JR., A PATIENT IN THE UNITED STATES VETERANS ADMINISTRATION HOSPITAL, LYONS, NEW JERSEY.
Superior Court of New Jersey, Juvenile and Domestic Relations Court, Essex County.
May 16, 1977.
*300 Mr. Daniel Baer, Assistant Deputy Public Advocate, attorney for W.S., Jr.
Mr. George W. Moore, attorney for Administrator of Veterans Affairs.
Mr. Anthony J. Nisivoccia, Assistant District Counsel, attorney for Veterans Administration Hospital, Lyons, New Jersey.
Mr. Thomas W. Clohosey, Assistant Essex County Counsel, attorney for Essex County.
CASS, J.J.D.R.C.
This matter was brought before the court on a notice of motion for an order authorizing the utilization of shock therapy in the treatment of W.S., Jr., an involuntarily committed patient at the Veterans Administration Hospital, Lyons, New Jersey (hospital). The hospital filed the motion with the court on May 12, 1977. Notice was given to W.S., his attorney, Essex County Counsel, the Essex County Adjuster, and the parents of W.S.
Because of the alleged emergent and critical condition of this patient and his immediate need for extraordinary treatment, the matter was specially heard on Monday, May 16, at the hospital. Present were the patient, his counsel, his mother and father, counsel for the hospital, an Assistant County Counsel, a representative of the office of the Essex County Adjuster and staff personnel of the hospital.
The patient, a veteran now 34 and single, was admitted to the hospital on April 9, 1965. A final order of commitment was entered by the Somerset County Court judge on August 6, 1965, adjudging W.S. insane and ordering his involuntary commitment to and confinement in a United States Veterans Administration Hospital "permanently or *301 until restored to his right mind or until further order of competent jurisdiction." A review hearing was held by the judge at the hospital on August 4, 1976, continuing his commitment. Thereafter his legal settlement was determined to be in Essex County. An order was entered on January 7, 1977 transferring the matter to the Essex County Court for all further proceedings thereon. On April 27, 1977 this matter came on for periodic review before the Essex County Juvenile and Domestic Relations Court, Domestic Relations Division, which hears all such reviews in this county. The judge found W.S. to be dangerous to himself and others as a result of a mental illness and ordered the commitment continued. Mention was made of the possible future need for shock treatments, but these were not requested because other modes of treatment were to be utilized, thereby hopefully obviating the need for same.
Mentally ill patients have the right to be informed of and participate in the decision-making aspects of their treatment. The Veterans Omnibus Health Care Act of 1976, enacted by Congress on October 1, 1976, incorporates provisions for the protection of veteran patients' rights, including the requirement that to the maximum extent practicable all patient care shall be carried out only with the full and informed consent of the patient or, in appropriate cases, a representative of the patient. 90 Stat. 2849, 38 U.S.C.A. § 4131.
The purpose of informed consent as set forth in the act's legislative history is to insure the development of regulations by the Veterans Administration to protect "the patient's right to decide, voluntarily, what is in his or her best `health' interest, weighing the risks involved against the potential gains." 1976 U.S. Code Congressional and Administrative News, at p. 6407. No such regulations appear to have been promulgated.
The care of mentally ill persons is, however, essentially a state function. Wells, by Gillig v. Attorney General of the United States, 201 F.2d 556 (10 Cir.1953). Provisions for *302 the protection of patient's rights are contained in N.J.S.A. 30:4-23 et seq., which title governs the admission and commitment of the mentally ill in New Jersey. Included in the general principles declarative of the public policy of this State is that found in N.J.S.A. 30:4-24:
(5) inasmuch as such mental disorders may in some cases substantially impair the individual's ability to guide his actions in his own best interests or with due regard for the rights of others, provision be made for the due process of law by which such an individual may be placed under protection, treatment or restraint in his own or the public interest; * * *.
N.J.S.A. 30:4-24.1 guarantees fundamental civil rights for every mentally ill patient, including medical care in accordance with accepted standards and the right of the patient to participate in the planning of his own treatment to the extent his condition permits. N.J.S.A. 30:4-24.2 details the rights of mentally ill patients in treatment, among which is the provision that "no patient may be presumed to be incompetent because he has been examined or treated for mental illness, regardless of whether such evaluation or treatment was voluntarily or involuntarily received." N.J.S.A. 30:4-24.2(c).
Under N.J.S.A. 30:4-24.2(d) each patient in treatment shall be entitled to certain designated rights, including:
(2) Not to be subjected to experimental research, shock treatment, psycho-surgery or sterilization, without the express and informed consent of the patient after consultation with counsel or interested party of the patient's choice. Such consent shall be made in writing, a copy of which shall be placed in the patient's treatment record. If the patient has been adjudicated incompetent a court of competent jurisdiction shall hold a hearing to determine the necessity of such procedure at which the client is physically present, represented by counsel, and provided the right and opportunity to be confronted with and to cross-examine all witnesses alleging the necessity of such procedures. In such proceedings, the burden of proof shall be on the party alleging the necessity of such procedures. In the event that a patient cannot afford counsel, the court shall appoint an attorney not less than 10 days before the hearing. An attorney so appointed shall be entitled to a reasonable fee to be determined by *303 the court and paid by the county from which the patient was admitted. Under no circumstances may a patient in treatment be subjected to experimental research which is not directly related to the specific goals of his treatment program. [Emphasis supplied]
There is no legislative history relating to this language.
The hospital seeks an order permitting shock therapy in the treatment of W.S. Jurisdiction of this court and the procedure to follow are set forth in N.J.S.A. 30:6 B-1 and 2; N.J.S.A. 30:4-23 et seq. Initial inquiry was directed to the question of whether the patient had given his consent and, if so, whether he was in fact capable of giving an informed consent. Prior to the taking of testimony the court was informed that W.S., after consultation with his counsel and his parents, was agreeable to this form of treatment. The court, however, advised by the patient's attending physician as well as by the hospital's chief of psychiatry that W.S. lacked the capacity to give such informed consent, rejected the patient's offer of consent and commenced the hearing to determine, in the first instance, the mental capacity of W.S. to give an informed consent to shock treatment.
This court has found no New Jersey case which has considered the question of informed consent in the factual setting presented herein, nor which has construed the statute governing same. See, however, Franklin v. Milner, 150 N.J. Super. 456 (App. Div. 1977), where the court, in discussing the concept of informed consent, stated that "the standard of informed consent is a legal concept that may depend upon expert medical knowledge and practices." In In re Schiller, 148 N.J. Super. 168 (Ch. Div. 1977), the court had before it an application for the appointment of a special guardian to consent to the amputation of the gangrenous right leg of a 67-year-old widower in order to prevent the spread of infection. It found the patient's competence to consent, or refuse to consent, to a medical procedure is a justiciable matter proper for the court to decide. It also found that the mental capacity to give consent to a surgical procedure is *304 the same as that required to enter into a contract, citing 17 C.J.S. Contracts § 133 (1), where it is stated:
The test of mental capacity to contract is whether the person in question possesses sufficient mind to understand, in a reasonable manner, the nature, extent, character, and effect of the act or transaction in which he is engaged; the law does not gauge contractual capacity by the standard of mental capacity possessed by reasonably prudent men. It is not necessary to show that a person was incompetent to transact any kind of business, but to invalidate his contract it is sufficient to show that he was mentally incompetent to deal with the particular contract in issue, * * *
In terms of mental capacity to consent, the court went on to lay down the test to include whether the patient has sufficient mind to reasonably understand the condition, the nature and effect of the proposed treatment, attendant risks in pursuing the treatment or not pursuing the treatment. An order was entered appointing a special guardian with authority to consent to life-saving medical treatment including amputation of patient's leg.
The discussion by that court of the doctrine of parens patriae jurisdiction, empowering it to appoint a "special guardian" upon the affirmative finding of a lack of mental capacity to consent, would appear to be equally applicable in the present case. While there is no provision in the rules authorizing the appointment of a special guardian in an emergent situation, nor specifying the procedure to follow, this court also takes the position that if W.S. were adjudicated incompetent to give an informed consent within the meaning of the statute (N.J.S.A. 30:4-24.2(d) (2)), then in the exercise of its parens patriae jurisdiction it can appoint such a special guardian.
Prior to the hearing in the instant case the attending psychiatrist explained to W.S. the need for shock treatment, the procedure to be followed and the risks inherent therein. He appeared ambivalent as to his decision. For example, the patient said he would consent to the treatment because he wanted it to chase the voices away, and that he would sign, *305 but that he wanted to condition the consent with the right to stop the treatments. In testifying it was this psychiatrist's opinion that W.S. was not capable of giving an informed consent by virtue of his mental condition, and that the need for shock treatment was immediate and emergent. He said the patient was hallucinating in the courtroom, actively psychotic, not in contact with reality and incapable of understanding or comprehending the nature and consequences of shock therapy, and with his impaired judgment he could not make this type of decision. The very organ impaired is the one required to give an appropriate and considered response. This testimony was substantially confirmed by the testimony of the hospital's chief of psychiatry. Given the testimony as above recited, the patient's long history of mental illness and treatment, of which more will be discussed infra, as well as the patient's appearance, behavior and remarks made in the courtroom, the court concluded that W.S. lacked the mental capacity to give an informed consent or refusal to consent. He was found to be incompetent to give an informed consent.
If there is a prima facie evidence of general mental incompetence, if there is time, and if there is some member of the family who will act as guardian, R. 4:83-1 should be followed for the appointment of a general guardian. In re Schiller, supra. Where, however, in an emergent situation, there is sufficient credible evidence of a mental patient's incompetence to give an informed consent or refusal to consent to shock treatment, this court not only may but has a duty to make an adjudication of such incompetence and to thereafter proceed to determine the necessity for shock treatments. N.J.S.A. 30:4-24.2(d) (2). In making such determination it must follow in all respects the statutory procedures and must not deny any of the patient's rights enumerated therein. N.J.S.A. 30:4-24.2(f).[1]
*306 Having determined W.S. to be incompetent for the limited purpose of giving informed consent or refusal to consent within the meaning of the statute, the hearing was continued to inquire into both the necessity for the shock treatment and whether an emergency situation prevailed requiring its immediate implementation. N.J.S.A. 30:4-24.2 (d) (2). Testimony by the patient's treating psychiatrist and the hospital's chief of psychiatry, as well as medical reports of the hospital's consulting psychiatrist and patient's psychiatrist, which were admitted into evidence by consent, clearly established the emergent nature of patient's condition and need for immediate treatment. All experts agreed as to his diagnosis of schizophrenia, paranoid type. Various modalities of treatment had been given over the years. Psychothrophic medications were prescribed of high dosage, including thorazine. Although he showed a good response to this latter medicine, it had adverse side effects and recently has had to be withdrawn. The experts characterized him as unpredictable, violent and assaultive of patients, physicians and staff members at the hospital. His condition had worsened, including an attempted suicide. On April 22, 1977 all patient privileges were removed and he was placed under restraint and given 24-hour one-to-one supervision. The consulting psychiatrist had examined W.S. on March 9, 1977 and recommended high-dose neuroleptics for six to eight weeks continuously, with shock therapy to be applied should W.S. fail to respond.
The recommendation for medication was followed up to the date of the hearing. Not only was there no improvement but the condition worsened. A conference of all the psychiatrists at the hospital was held and it was agreed that shock treatment should be undertaken. The chief of psychiatry, who had been familiar with W.S. for ten years, as well as the treating physician, both testified that his condition had *307 reached emergent proportions, that the procedure requested was imperative, with probable serious consequences to the patient if not commenced immediately. As all the necessary work-up had been completed, the shock treatment could begin within two days if court approval were granted.
The patient, as well as his counsel and his parents, were present throughout the hearing. All testimony was taken before a court reporter. W.S. was afforded the opportunity to be confronted with and to cross-examine all witnesses in accordance with his statutory right. His parents were agreeable to the proposed treatment, and each was willing to serve as a special guardian to give consent. Patient's own psychiatrist, independently chosen by patient's counsel and whose written report was admitted into evidence, concurred in the use of said treatment.
The court, having determined that W.S. was incompetent to give an informed consent to shock treatment, and further finding that the hospital had carried its burden of proving the necessity of the requested treatment on an emergent basis, entered an order appointing the mother, D.S., special guardian for the purpose of consenting to modes of treatment for her son, including shock treatment.
NOTES
[1] Neither the procedure set forth in N.J.S.A. 3A:27-1 et seq. (the Uniform Veterans' Guardianship Act), nor that embraced in R. 4:83-9, dealing with veterans' benefits and the appointment of a guardian to receive said benefits, is applicable here.