678 A.2d 751

IN RE J.M., A MINOR AND ALLEGED INCOMPETENT.

Superior Court of New Jersey
Chancery Division Probate Part
Camden County

Decided March 28, 1996.

226

*John C. Connell* for Petitioner, Bancroft Incorporated (*Archer & Greiner*, attorneys).

*F. Michael Dailey* for J.M., a developmentally disabled minor (*Quinlan, Dunne & Daily*, attorneys).

*Marilyn D. Williams,* Esq., attorney for New Jersey Protection and Advocacy, Inc.

*Parents of J.M.,* pro se.

THEODORE Z. DAVIS, P.J.Ch.

This opinion supplements the oral opinion of the court rendered on March 14, 1996.

J.M. is a nine year old developmentally disabled child who presently resides in Providence, Rhode Island, at a facility which is successfully treating her with electric shock by way of a system known as the Self–Injurious Behavior Inhibiting System (SIBIS). Although J.M. is presently an out-of state resident, she, as well as her parents, are domiciliaries of Monmouth County, New Jersey.

J.M.'s parents are desirous of having her treated at a facility in New Jersey so that they can be closer to her and have a greater impact upon her future development. There now exists in New Jersey a facility which has received administrative approval from the State for the administration of SIBIS.[1] However, before such treatment can commence, the Developmentally Disabled Rights Act, *N.J.S.A.* 30:6D–5a(4), requires that a judicial hearing as to the necessity of such treatment be conducted; requires the appointment of a guardian ad litem for the continuation of such treatment and requires that the developmentally disabled person be represented by counsel and be physically present at the hearing. It is the statutory requirement of the physical presence of J.M. in court which presents for the first time the question as to

---

[1] On May 31, 1995, the Division of Developmental Disabilities (DDD), pursuant to its Division Circular # 34, which covers its policy on "Behavior Modification Programming", approved Bancroft's application and protocol for the administration of SIBIS to J.M., subject to court approval as to its necessity and the appointment of a guardian ad litem.

whether this requirement is mandatory or directory.[2] The neces-
sity of the SIBIS treatment, the standard of proof required and
the suitability of the parents as guardians ad litem are the other
issues which must be resolved.

## Parties

Bancroft Incorporated is a non-profit entity providing treatment
and educational services to individuals with developmental disabili-
ties and is located in Haddonfield, Camden County, New Jersey.
The Marlboro Township Board of Education, Monmouth County,
New Jersey, is the district responsible for the educational needs of
J.M., pursuant to *N.J.S.A.* 18A:46–1 to –13, *N.J.A.C.* 6:28–6.1(a)
and the Individuals With Disabilities Education Act (IDEA), 20
*U.S.C.A.* §§ 1400–1491, which mandates free and appropriate pub-
lic education. Monmouth County is the governmental entity
responsible for the fees of any attorney the court appoints to
represent the interests of the disabled. *N.J.S.A.* 30:6D–5a(4).
New Jersey Protection and Advocacy, Inc. (P & A), is an entity
which is federally funded under the Developmental Disabilities
Assistance and Bill of Rights Act, 42 *U.S.C.A.* §§ 6041–6043, as
amended, and was created after the demise of the Department of
the Public Advocate, whose duties were then assumed by the
Office of the Public Defender of New Jersey. *N.J.S.A.* 52:27E–65.
Accordingly, P & A proceeds under federal law, but is not a part
of any state agency. However, it now controls those matters
which were traditionally handled by the former Public Advocate's
office.[3] Bancroft was instructed to give notice of its petition to all

---

[2] In *In re Grady*, 85 *N.J.* 235, 258, 426 A.2d 467 (1981), the Court agreed with
the trial court that *N.J.S.A.* 30:6D–5a(4) was not applicable. However, the Court
stated that "[t]he incompetent person need not be present at the proceedings if
the court determines that his presence would not be useful in protecting his
rights."

[3] "All of the functions performed by the current State agency-based protection
and advocacy system shall, effective October 1, 1994, be performed by New
Jersey Protection and Advocacy, Inc...." Letter of Governor Whitman to U.S.
Dept. Of Health and Human Services, dated, September 27, 1994.

other interested parties. Those parties were given the opportunity to intervene and be heard. No one who was noticed sought to intervene pursuant to the rules of court, *R.* 4:33–2, thereby leaving Bancroft, J.M. and J.M.'s parents, who were not represented by counsel, as the only formal participating parties. However, on the date of trial, P & A orally requested to participate. Those properly participating consented, and this court granted P & A leave to participate in the hearing.

## Jurisdiction

 The jurisdiction of the court over this guardianship proceeding is based upon its inherent *parens patriae* powers, *In re Grady*, 85 *N.J.* 235, 259, 426 *A.*2d 467 (1981); *see also In the Matter of D.K.*, 204 *N.J.Super.* 205, 217–223, 497 *A.*2d 1298 (Ch.Div.1985), and its statutory authority, *N.J.S.A.* 30:6D–5a(4). *E.g., In re W.S.*, 152 *N.J.Super.* 298, 303, 304, 377 *A.*2d 969 (J. & D.R.Ct.1977) (citing related jurisdictional statutes, *N.J.S.A.* 30:6B–1 & 2; *N.J.S.A.* 30:4–23, in granting application for guardian ad litem to consent to electro-shock therapy for institutionalized incompetent). *See also, N.J.S.A.* 3B:12–25.

## Waivability of statutory requirement of incompetent's appearance in court

The Developmentally Disabled Rights Act, more particularly, *N.J.S.A.* 30:6D–5a(4), requires the physical appearance in court of those covered under it so that they may confront and cross-examine all parties alleging, and all witnesses supporting, the necessity of that type of treatment over which the Legislature has expressed its desire to control. The state's concerns under this subsection relate to the use of shock treatment, psychosurgery and the performance of sterilization upon patients, or the use of patients for medical-behavioral or pharmacological research. The statute, in pertinent part, reads as follows:

Either the party alleging the necessity of such procedure or such person or such person's guardian ad litem may petition a court of competent jurisdiction to hold a hearing to determine the necessity of such procedure *at which the client is physically present*, represented by counsel, and provided the right and opportunity

to be confronted with and to cross-examine all witnesses alleging the necessity of such procedure.

[*Id.* (Emphasis supplied).]

To carry out the statutory scheme, which was clearly enacted for the benefit of the developmentally disabled, J.M. has to be transferred to New Jersey and be physically present in court for the duration of the hearing. During whatever period of time a hearing will take, J.M. cannot receive electric shock therapy in New Jersey until a favorable determination as to its necessity is made.[4]

 Before the question of whether a statutory provision can be waived, it must be determined whether the Legislature intended the requirement to be mandatory or directory. In making such determination, the entirety of the statute and a consideration of the object sought to be accomplished must be considered. Norman J. Singer, *Sutherland Statutory Construction* § 25.03 at 450 (5th ed. 1993). The clear purpose of the statute is to protect persons who are developmentally disabled because of conditions such as mental retardation, cerebral palsy, epilepsy, autism, or dyslexia. *N.J.S.A.* 30:6D–3. The statute prohibits any discrimination against these persons because of their disability; that is, they are entitled to the same constitutional and statutory rights as every other citizen; such as, the right to admission to all facilities, the right to register and vote at elections and the free exercise of religion. Additionally, they have the statutory right to receive and send unopened correspondence, interact with members of the opposite sex, have private telephone conversations and visitations and have their personal and medical records handled confidentially. *N.J.S.A.* 30:6D–4 a–f.

The statute in its entirety signals a purpose to surround the developmentally disabled with many procedural and substantive safeguards so that their persons and property may not be taken advantage of. It is a statute designed solely for their protection.

---

[4] The hearing took two full days.

Often, the beneficiaries of the statute have neither the physical or mental capacity to insist upon the rights the Legislature has given them.

J.M. has been diagnosed as having hydrocephalus secondary to aqueductal stenosis, requiring placement of a shunt. She has also been diagnosed as severely mentally retarded, autistic and with pervasive developmental and seizure disorders. She is significantly developmentally delayed and non-verbal. In addition to these maladies, she engages in self-injurious behavior which continually places her at serious risk of bodily harm and possible death. The evidence established beyond any doubt that the court, J.M.'s court-appointed attorney, P & A or any other interested party would not be able effectively to communicate with J.M. The most that could be accomplished would be to observe her during her suffering. These observations would most assuredly demand the continuous attention of the court and all parties and would destroy or seriously impair the ability of the court to conduct a meaningful hearing. A video tape of her conduct was provided to the court.

This court concludes that the Legislature did not intend its requirement of the physical presence of developmentally disabled persons to be one which, if not met, would deny to such persons the benefits sought to be bestowed upon them. This requirement does not go to the essence of that which the law intended. *See Borough of Paramus v. Block 1527, Ridgewood Park Estates,* 42 *N.J.Super.* 369, 375, 126 *A.*2d 660 (App.Div.1956). This is so because the purposes for which the act was created are not frustrated by the person's absence. The Legislature must have foreseen these circumstances, for it clearly stated that such persons must be represented by counsel. The rights of such persons are protected by the presence of counsel, not by the non-communicative presence of the incompetent. In this regard, the representation of counsel may easily be construed as mandatory. If one were not appointed, there would be no one effectively to speak for the client and the purpose of the act would then clearly be frustrated. Accordingly, the requirement for the physical pres-

ence of a developmentally disabled person at a hearing to determine the necessity of electric shock treatment is directory and, therefore, waivable. The question then becomes, whether J.M.'s appearance should be waived under the circumstances of this case.

The manifestation of J.M.'s condition has been to some extent controlled, but only by the utilization of SIBIS on an uninterrupted when-needed basis. The facility in Rhode Island is several hours away from this court, and during her travel to this court, if required, there exists a distinct probability that SIBIS would have to be utilized. It, of course, could not be, since no authority for its administration outside of Rhode Island exists. The medical proofs presented supports the conclusion that J.M. would be subjected to extraordinary risks of regression and physical and mental harm, all of which could be permanent if she could not be treated. It should be mentioned at this point that the pharmacological treatment to which she had been subjected, without SIBIS, was totally ineffective and would not be, therefore, beneficial during her travel to New Jersey. Not only would the lack of treatment during travel create a risk for J.M., but her stay in New Jersey during the course of the hearing would simply make a bad circumstance worse, especially since the length of the hearing could not be determined and there cannot be any treatment until a favorable determination is reached.

Because of these circumstances, the court requested counsel to investigate video conferencing as a possible substitute for the statutorily required physical presence of J.M. The court-appointed counsel would be with J.M. in Rhode Island, along with the treating physicians, while the court, Bancroft, including its attorney and expert witnesses, and P & A, would remain in New Jersey. Because such an arrangement would necessitate an expenditure of $450 per hour, and because it was not then known how long it would take to conduct the hearing, especially since P & A's position made it an adversarial one, this court concluded that this alternative was not viable, even if it were to conclude that such procedure would satisfy the requirement of the act.

Where no benefit can be reasonably derived from the physical presence in court of a developmentally disabled person and where such presence could in fact diminish or destroy the purpose for which the requirement was imposed—that is, the enforcement of one element of a complete statutory scheme would have the effect of destroying the clearly defined legislative purpose—such requirement should be waived. Having determined that the requirement is directory and therefore waivable and that J.M.'s presence in court would not be beneficial to her or the parties, that her presence would be counter productive and that the court's appointment of counsel adequately protects her interest, J.M.'s presence is hereby waived.

Further, and in conclusion, this approach is observable in *N.J.S.A.* 3B:13A–4 (Administration Of Estates), where the Legislature requires the attendance of a conservatee, but waives such requirement for reasons of physical or other inability, which must be established to the satisfaction of the court.

### Necessity of Treatment

**A.** *Standard of proof required*

▉ Although *N.J.S.A.* 30:6D–5a(4) does not mention the standard of proof by which necessity should be established, *In re Grady,* 85 *N.J.* 235, 266 (1981), is instructive in that it held that a trial court must be persuaded by clear and convincing proof where involuntary sterilization is at issue. Since both sterilization and electric shock treatments are covered by *N.J.S.A.* 30:6D–5a(4), this court can see no reason why the standard should be different, even though the Court stated that the statute did not apply in that particular instance. Accordingly, the standard of proof required to show necessity of electric shock treatment, such as SIBIS, is that of clear and convincing proofs.

**B.** *Necessity of treatment*

▉ In 1989, at the age of two to three years, J.M. developed a pattern of self-injurious behavior (SIB) after a shunt infection. This pattern was manifested in episodes of hair pulling, jaw

snapping, tongue and mouth biting, and self-inflicted blows to the jaw and mouth, among others. She was initially referred to the Kennedy Institute at Johns Hopkins University, where she was treated with medications and aversive therapies, such as physical and mechanical restraints. This treatment proved ineffective in arresting J.M.'s SIB. Although discharged some four months later, her self injurious behavior continued and required periodic hospitalization.

In the summer of 1990, J.M. was admitted to the Bradley Hospital in Rhode Island due to chronic, severe SIB (self injurious behavior). She has remained at Bradley continuously since that time to date. During her stay at Bradley, there were multiple concentrations of her psychiatric medications. Also, her SIB was sought to be controlled by the use of mechanical restraints and various behavioral treatment approaches. These forms of treatment were not effective in reducing and maintaining the SIB at a manageable rate. Consequently, the repeated incidents of self-injury resulted in considerable physical damage to the area of her jaw and mouth, and significantly compromised her health.

In May 1992, anti-convulsant treatment was initiated subsequent to a neurological evaluation and an EEG, which revealed the presence of a seizure disorder that was being manifested in head dropping episodes and sudden awakenings with head shaking. In September 1992, while still in treatment at Bradley, J.M. was admitted to Children's Hospital in Boston, Massachusetts for surgical treatment of an osteomyelitis of her left jaw precipitating a surgical resection with placement of a titanium plate and a long course of inpatient medical treatment for this condition. Discharge did not occur until June 1993, when she was discharged post-surgically to Bradley. Thereafter, her incidence of self-abuse continued to be quite high, particularly targeting the right ear and jaw. The focus of her subsequent self-abuse resulted in a badly traumatized ear which could only be protected with a specially made helmet. In addition, she did traumatize her chin sufficiently over the next two months so that she was hospitalized at Pawtuck-

et Memorial Hospital to treat a developing cellulitis with intravenous antibiotics. Further, and because of the trauma to, and infection of, her jaw, all of J.M.'s teeth had to be removed. Additionally, J.M. pulled out *all* of her hair. Notwithstanding J.M.'s admissions, readmissions and subsequent discharges to and from the Boston, Children's and Pawtucket hospitals between 1991 and October of 1993, sometimes on a monthly basis, her self-injurious behavior continued. Because of these circumstances, the staff at Bradley made repeated recommendations to J.M.'s parents to initiate contingent electrical stimulation, but the parents declined to do so in favor of other less drastic aversive therapies. These alternative therapies, such as medication, restraints and differential reinforcement of other behaviors continued to be used and continued to be ineffective. After extensive consultation with, and consent from, J.M.'s parents, the clinical team at Bradley decided to treat J.M.'s self-injurious behavior with the Self-Injurious Behavior Inhibiting System (SIBIS).

SIBIS is a Class II medical device which involves the remote administration by a trained clinician of low intensity electrical stimulation contingent upon the observation of targeted forms of self-injurious behavior. The SIBIS system consists of a stimulus unit, containing a power source of a nine volt alkaline battery, and a transmitter. The transmitter is operated by a trained clinician, and requires the depression of a release switch simultaneous with an activation button. The stimulus unit is strapped onto an extremity of the patient and rotated approximately hourly among extremity sites. This prevents the flow of electrical current through the main body cavity or any essential organ, and reduces extended exposure of any single extremity site to prolonged multiple stimulation. The energy released by this device is relatively minimal in its force and extremely brief in its duration. The electrical current is a maximum 3.5 milliamperes delivered for eighty milliseconds in sixteen pulses of five milliseconds each over a 200 millisecond period. It is said that the pain is similar to a bee sting. This fact is true, the court having subjected itself to the stimulation. This treatment is to be distinguished from

electro-convulsive shock therapy, which utilizes much higher electrical voltage in order to induce grand mal seizures.

Since its implementation as a treatment procedure, the frequency of J.M.'s self-injurious behavior decreased dramatically to a rate of zero to twelve times per day from a previous rate ranging from 300 + times per day to the extraordinary sum of 3000 times per day. The secondary positive impact of the SIBIS procedure has been remarkable. J.M. no longer requires mechanical restraints. As a result, she is able adaptively to participate in all activities and special therapies, which include physical therapy, occupational therapy and speech and language therapy. She is currently integrated into the accredited campus school program at Bradley. This improvement has enabled J.M. to begin acquiring a range of repertoires whose acquisition was previously precluded by the high rates of self-injury. J.M. is able to use gestures as a means of communication. She is now learning to brush her teeth, dress and undress, and sit in and attend a school setting. J.M. also has limited independence with other skills of daily living. With assistance, she can pull on and remove her clothing. She is able to self-feed with assistance, but is not able to use eating utensils independently. She is not currently toilet trained, but is being considered for a toilet training program. She is wheelchair bound, but is able to walk for short periods of time and distances with assistance. In addition, she is now able to mobilize her wheelchair independently and self-propel her wheelchair within her classroom and living area. Prior to the use of SIBIS, she was able to learn none of these skills. Because of these successes, J.M. has been weaned off most topical skin treatments, pain medications, and all antibiotics.

There are certain risks inherent in the use of SIBIS, such as discomfort from electrical stimulation, accidental electric shock, malfunction, and deliberate misuse. However, in a controlled and supervised environment, the probability of such risks is low. On the other hand, the benefits include (1) precise quantification of the administration of the electrical stimulation, which is discrete

and inescapable yet promptly terminated, (2) consistent consequences, (3) immediate and rapid delivery, (4) limited interference with ongoing activities, (5) decreased physical risk, (6) avoidance of lethargy and similar side-effects from medications, which seriously restrict or completely preclude other functional development, (7) reduced drug dependency and (8) significantly enhanced probability of ultimate stabilization. These benefits are profound and heavily outweigh the relative risks.

Accordingly, it is the opinion of this court that the proofs submitted by the applicant and J.M.'s parents clearly and convincingly establish that SIBIS is a necessary element of J.M.'s right to effective treatment. It is the finding of this court that, without this treatment, her remarkable developmental progress would not have been possible.

■ Although Bancroft's application to the New Jersey Department of Human Services, Division of Developmental Disabilities (DDD) for approval of the placement of J.M. and funding at Bancroft, along with its intended protocol of treatment, was received into evidence and there was some discussion or examination of witnesses regarding the protocol, the propriety of the protocol is not in issue in this case for several reasons. First, the protocol has already been reviewed and approved by DDD consistent with the requirements of Division Circular 34. That decision has not been formally challenged in this court through the introduction of contrary proofs. Furthermore, as a procedural matter this court has no power to exercise jurisdiction to review the action of a state administrative agency. R.2:2–3(a)(1).

### The Appointment of a Guardian ad litem

New Jersey Protection and Advocacy, Inc. (P & A), throughout this litigation, has taken a position that the parents of J.M. should not be appointed as guardians ad litem. Its reasoning was simply that the parents are, and would be, too emotionally involved and that this would create an unreasonable risk that any decision they would make may not be in the best interest of J.M.

The Legislature has established a statutory preference in favor of family members in the appointment of special guardians to consent to medical treatment of an alleged incompetent. *N.J.S.A.* 3B:12–25 (superseding *N.J.S.A.* 3A:6–36). Our courts have routinely and repeatedly followed this legislative preference in numerous other circumstances requiring sensitive decisions by guardians. For example, family members are routinely appointed guardians for alleged incompetents for the purpose of medical treatment. *See, e.g., Nathan & Miriam Barnert Mem. Hosp. Ass'n v. Young,* 63 *N.J.* 578, 311 *A.2d* 1 (1972) (sister of patient appointed special guardian to consent to amputation procedure where patient was found mentally incompetent to consent); *In re Schiller,* 148 *N.J.Super.* 168, 186, 372 *A.2d* 360 (Ch.Div.1977) (cousin of incompetent patient appointed special guardian with authority to consent to lifesaving medical treatment).

Likewise, even in those most extreme situations requiring some form of substituted judgment concerning the ultimate legal and moral issue of continuation or withdrawal of life-support treatment, our Supreme Court has consistently urged reliance on the judgment of the patient's family, the parents in particular, as the most appropriate decision-makers. *E.g., In the Matter of Peter, by Johanning,* 108 *N.J.* 365, 384, 529 *A.2d* 419 (1987) ("close caring family member" is preferred as person to make life-support decisions); *In re Jobes,* 108 *N.J.* 394, 418–19, 529 *A.2d* 434 (1987) ("the family is best able to decide what the patient would want . . . [including] a spouse, parents, adult children, or siblings"); *In the Matter of Conroy,* 98 *N.J.* 321, 384–85, 486 *A.2d* 1209 (1985) (under limited-objective or pure-objective tests, "the family—that is, the patient's spouse, parents, and children . . .—must also concur in the decision. . . ."); *In re Quinlan,* 70 *N.J.* 10, 53, 355 *A.2d* 647 (1976), *cert. denied,* 429 *U.S.* 922, 97 *S.Ct.* 319, 50 *L.Ed.2d* 289 (1976) (father who sought appointment as guardian ad litem of incompetent daughter and who sought power to discontinue her life-support was entitled to statutory preference given to next of kin in appointment of guardian). Indeed, this preference

for family as guardian, as against other persons, is followed, unless it is shown, to the court's satisfaction, that appointment of next-of-kin would be contrary to the best interests of the incompetent. *In re Roll,* 117 *N.J.Super.* 122, 124, 283 *A.*2d 764 (App.Div.1971). *See also* Pressler, *Current N.J. Court Rules,* Comment on *R.* 4:86–6 at 1463 (1996) (citations omitted) ("[t]he next of kin of the incompetent, determined in accordance with the traditional table of consanguinity, is absolutely entitled to the guardianship appointment unless such appointment is clearly contrary to the best interests of the incompetent or his estate").

■ This court listened in awe, and with profound respect for, the efforts of both parents regarding the care of J.M. They involved themselves in every aspect of J.M.'s treatment and exercised extraordinary restraint in not subjecting J.M. to what some may conclude is harsh treatment for a young child; i.e., electric shock treatment. It was not until they had personally conversed with practically all known experts in the United States concerning electric shock treatment, and mastered the knowledge which each imparted, that they consented to subjecting J.M. to SIBIS. The parents have also involved J.M.'s sibling in their endeavors, so that they would act as a family whole, all of which is obviously beneficial to J.M. J.M.'s relationship with her sibling is quite positive. For approximately five and one-half years the parents have acted in the best interest of J.M. The results speak for themselves. During the course of this trial, at no time did P & A offer any fact which would indicate that the parents had conducted, or would likely conduct themselves, in a manner adverse to J.M.'s interests. Notwithstanding these facts, P & A insists that the parents should not be appointed.

Where no contrary facts are presented, where the facts which were presented were clearly and irrefutably trustworthy and where the authority presented by the objector was totally inapposite, there are no other conclusions to reach than that J.M.s parents are eminently qualified to be her guardians ad litem and that the statutory preference should be invoked, allowing them to

provide informed consent for the administration of SIBIS by Bancroft.

## Conclusion

For all of the reasons previously stated, it is the opinion of this court that (1) the requirement for the physical appearance of an incompetent in court, as required under and pursuant to *N.J.S.A.* 30:6D–5a(4), is directory only, and therefore, J.M. need not under the facts of this case be present; (2) the standard of proof required to determine the necessity of electric shock treatment, such as SIBIS, is by clear and convincing proof; (3) that under the facts of this case, the necessity of SIBIS was clearly and convincingly shown and (4) that the parents of J.M. are unquestionably academically and emotionally qualified to be guardians ad litem for J.M.