885 A.2d 974

IN THE MATTER OF A.A., AN ALLEGED
INCAPACITATED PERSON.

Superior Court of New Jersey
Chancery Division Somerset County

Decided: March 24, 2005—Supplemented: July 8, 2005.

*Steven B. Lieberman*, for applicant Carrier Clinic (*Bowers Murphy Lieberman*, attorneys).

*Thomas O'Loughlin*, for A.A.

WILLIAMS, P.J.Ch.

This matter comes before the court on an application from Carrier Clinic to administer electro-convulsive therapy (hereinafter ECT) to A.A., using the consent of her daughter C.M. who was named as A.A.'s decision maker under a living will. The living will was drafted on January 25, 2005. A.A.'s other children also support this decision. Carrier Clinic is a non-profit psychiatric hospital and the only facility in the state that administers ECT involuntarily. A.A. is an involuntarily committed patient who suffers from severe depression with psychotic features. The attorney for Carrier Clinic represented to the court that A.A. was not capable of participating in decisions regarding her medical treatment. This position was supported by Dr. Jessica Berlet whose specialty is psychiatry and is the attending physician for A.A. She further indicated that A.A.'s mental condition and health had declined very rapidly in recent weeks. She viewed ECT as

vital to her recovery. With ECT it was opined that A.A. could regain the ability to participate in future decisions. Dr. David Greenspan, also a psychiatrist, lent further support to the request for ECT. He opined that without ECT, A.A.'s prospects for recovery were bleak.

Thomas O'Loughlin was appointed as A.A.'s attorney. He represented her at the most recent commitment hearing and was invited to participate in this application.

O'Loughlin agreed that ECT was necessary treatment desirable for A.A.

With those facts before it, the court considered the question of whether the living will executed by A.A. constituted sufficient authorization for the administration of ECT. In order to answer this question it is necessary to review several related areas of law.

*N.J.S.A.* 30:4–24 *et. seq.* governs the admission and commitment of the mentally ill. *N.J.S.A.* 30:4–24(3) & (5) dictate this State's public policy concerning committed individuals. These provisions state:

(3) the human dignity and the moral and constitutional rights of such individuals be upheld and protected by appropriate statutes;

(5) inasmuch as such mental disorders may in some cases substantially impair the individual's ability to guide his actions in his own best interests or with due regard for the rights of others, provision be made for the due process of law by which such an individual may be placed under protection, treatment or restraint in his own or the public interest;

Additionally, *N.J.S.A.* 30:4–24.1 mandates:

"Every patient shall have the right to participate in planning for his own treatment to the extent that his condition permits."

Our Legislature has also deemed it appropriate to establish a bill of rights for institutionalized individuals, which is contained in *N.J.S.A.* 30:4–24.2(d) and states in relevant part:

Each patient in treatment shall have the following rights, ... (2) Not to be subjected to experimental research, shock treatment, psychosurgery or sterilization, without the express and informed consent of the patient after consultation with counsel or interested party of the patient's choice. Such consent shall be made in writing, a copy of which shall be placed in the patient's treatment record. If the patient has been adjudicated incompetent a court of competent jurisdiction

shall hold a hearing to determine the necessity of such procedure at which the client is physically present, represented by counsel, and provided the right and opportunity to be confronted with and to cross-examine all witnesses alleging the necessity of such procedures. In such proceedings, the burden of proof shall be on the party alleging the necessity of such procedures. In the event that a patient cannot afford counsel, the court shall appoint an attorney not less than 10 days before the hearing. . . .

Thus to proceed to administer ECT without consent it would normally be necessary for the court to determine that an individual was mentally or physically unable to govern or manage his affairs and conduct an incompetency hearing. *In re Lindsley*, 43 *N.J.Eq.* 9, 10 *A.* 549 (Ch.1887); *In Re Perrine*, 41 *N.J. Eq.* 409, 5 *A.* 579 (Ch.1886). The court rules are specific as to the procedures to be followed. *See R.* 4:86–1 to –12. After a finding of incompetency the court would need to follow the procedures outlined above to determine the necessity of the ECT treatment.

The seminal case dealing with electroshock therapy is *In re W.S.*, 152 *N.J.Super.* 298, 377 *A.*2d 969 (J. & D.R. Ct.1977). In *W.S.* an order authorizing shock therapy for an involuntarily committed patient was sought. The *W.S.* court reviewed the relevant New Jersey statutes, including *N.J.S.A.* 30:4–24(5); *N.J.S.A.* 30:4–24.1; and *N.J.S.A.* 30:4–24.2(d), and concluded that:

If there is a prima facie evidence of general mental incompetence, if there is time, and if there is some member of the family who will act as guardian, *R.* 4:83–1 should be followed for the appointment of a general guardian. *In re Schiller, supra.*[, 148 *N.J.Super.* 168, 372 *A.*2d 360] Where, however, in an emergent situation, there is sufficient credible evidence of a mental patient's incompetence to give an informed consent or refusal to consent to shock treatment, this court not only may but has a duty to make an adjudication of such incompetence and to thereafter proceed to determine the necessity for shock treatments. *N.J.S.A.* 30:4–24.2(d)(2). In making such determination it must follow in all respects the statutory procedures and must not deny any of the patient's rights enumerated therein. *N.J.S.A.* 30:4–24.2(f).

[*W.S., supra,* 152 *N.J.Super.* at 305, 377 *A.*2d 969.]

The court thereafter, pursuant to the rules and statutes, concluded that *W.S.* was incompetent to give or refuse consent and that he needed shock treatment. It should be noted that the patient and counsel were present throughout the hearing. The hearing was on the record and *W.S.* was afforded the opportunity

to cross-examine the witnesses as provided for by *N.J.S.A.* 30:4-24.2(d)(2).

The request presented to the court by A.A.'s application is to determine whether the living will executed by A.A. eliminates the need for a finding of incompetency, the appointment of a guardian and/or the hearing required to determine the necessity of ECT. A.A. delegated the decision-making process to her daughter in advance of her health's deterioration. Therefore, Carrier Clinic asks the court to determine no formal court proceedings are necessary. Stated otherwise, Carrier argues that the daughter/decision-maker's consent can substitute in all respects for that of the patient.

Before arriving at an answer the court considered the rationale for the imposition of such formal court procedures prior to the involuntary administration of ECT. It is the court's understanding that individuals who are depressed suffer from a serious mental illness that negatively affects one's feelings, thought processes and actions. It is commonly characterized as a deep feeling of sadness. Symptoms may include fatigue, listlessness, a feeling of being helpless, hopeless, and overwhelmed by life. Emotional and physical withdrawal is common, http://www.psych. org/public_info/depression.cfm. Treatment may include medication, psychotherapy or both. ECT is usually considered only for patients with a major depression disorder. It may be the treatment of choice when there is a need for an urgent response such as when there are indications of suicidal tendencies or a patient has become nutritionally compromised.

The American Psychiatric Association now has very specific guidelines for the administration of ECT. It is to be used only to treat severe, debilitating mental disorders and not to control behavior, http://www.healthy place.com/communities .depression/treatment /ect/index.asp. In most states, written and informed consent is required because it is the most controversial treatment in psychiatry. *Ibid.* However, clinical evidence indicates that for uncomplicated cases of severe major depression, ECT will produce

a substantial improvement in at least eighty percent (80%) of patients, Review of Psychiatry, Indications for Use of Electroconvulsive Therapy, at 45881, citing 7 R.D. Weinger, C.E. Coffey, American Psychiatric Press Inc. 1988, http://www.psych. org/research/apire/ training_fund/ clin_res/index.cfm#1 (last visited on April 27, 2005). ECT has also been shown to be effective in depressed patients who do not respond to other forms of treatment, Review of Psychiatry, Treatment of medication Resistant Depression With Electroconvulsive Therapy, at 91115, citing 9 H.A. Sackheim, J. Prudic, D.P. Devanand, American Psychiatric Press Inc. 1990, http://www.psych. org/research/apire/ training_fund/clin_ res/index.cfm# 2 (last visited on April 27, 2005). It can be life saving and produce dramatic results, at http:// www.healthy place.com/Communities /Depression/treatment /ect/article_popolos .asp.

As to the logistics of the procedure, the National Mental Health Association indicates

"ECT treatment is generally administered in the morning, before breakfast. Prior to the actual treatment, the patient is given general anesthesia and a muscle relaxant. Electrodes are then attached to the patient's scalp and an electric current is applied which causes a brief convulsion. Minutes later, the patient awakens confused and without memory of the events surrounding the treatment," National Mental Health Association, http://nmha.org /infoctr/factsheets/ ect.cfm (last visited April 27, 2005).

This treatment is usually repeated three times a week for approximately one month. The number of treatments varies from six to twelve. It is often recommended that the patient maintain a regimen of medication, after the ECT treatments, to reduce the chance of relapse, National Mental Health Association, http:// nmha.org /infoctr/factsheets/ ect.cfm (last visited April 27, 2005).

A side effect to ECT is short-term memory loss, but several studies conclude that patients who received unilateral ECT performed better on attention/memory tests than those who received bilateral ECT. *Ibid.* However, there is a question as to whether unilateral is as effective. *Ibid.* Experts agree that changes in memory function do occur and persist for a few days following treatment, but that patients return to normal within a month.

*Ibid.* While some memory loss is frequent after ECT, it is estimated that one-half of one percent of ECT patients suffer a severe loss, National Institutes of Health, Consensus Development Conference Statement (June 10–12, 1985), http://www.healthy place.com/communities /depression/treatment/ ect/article_popolos. asp. Memory problems usually clear within seven (7) months of treatment, although there may be a persistent memory deficit for the period immediately surrounding the treatment. *Ibid.* In the situation. presented to the court, all indications are that this treatment is necessary and it is requested by all of the patient's family members and key medical personnel involved with A.A.'s care.

With an awareness of the drawbacks and benefits the court will proceed to resolve whether the preauthorization set forth in the living will permits C.M. to make the decision to avoid the procedures and protections normally applicable to a situation where the patient is incapable of making their own decisions.

The statute that would authorize such a decision is *N.J.S.A.* 26:2H–53 *et seq.* and is known as the Advanced Directives for Health Care Act. It became effective in January of 1992. The statute recognizes "the fundamental right of individuals to make health care decisions" and further explains that society has an interest in ensuring sound health care decisions which includes the protection of vulnerable patients and facilitation of informed and voluntary patient choice. *N.J.S.A.* 26:2H–54. The policy considerations supporting the act's implementation are clearly set forth within the act itself. It states that New Jersey recognizes the inherent dignity and value of human life and within this context recognizes the fundamental right of individuals to make health care decisions to have life-prolonging medical or surgical means or procedures provided, withheld, or withdrawn. *N.J.S.A.* 26:2H–54 (b). Society has an interest in ensuring the soundness of health care decision making, including both protecting vulnerable patients from potential abuse or neglect and facilitating the exercise of informed and voluntary patient choice. *N.J.S.A.* 26:2H–54 (d).

The act permits a person to execute a document giving instructions as to how health care should be administered in the event the principal becomes unable to make particular health care decisions. The attending physician then must make the determination of the patient's lack of capacity in writing, stating the specific nature, cause, extent and duration of the condition. Unless the patient's lack of decision-making capacity is clearly apparent to both the physician and the health care representative, it must be confirmed by a second physician. *N.J.S.A.* 26:2H–60. In the case of mental illness a psychiatrist is necessary.

It is the finding of this court that A.A. sought to protect her right to make health care decisions by drafting a living will. A.A.'s living will noted that:

a time may come when I cannot participate in my medical care decisions. . . [I]t is not possible for me to anticipate the very wide variety of medical decisions which may need to be made in the future and to provide specific written directions. Accordingly, I appoint the persons named below, in the order named unless otherwise noted as my medical Decision Attorney–In–Fact to implement my health care decisions: [street address of C.M. omitted for purposes of protecting her privacy]

Therefore, A.A. authorized and directed her Medical Decision Attorney–In–Fact to plan and arrange for all medical care and related health care and treatment on her behalf and at her expense. *Living Will, Paragraph 10.*

There can be little doubt that A.A. intended her daughter to act on her behalf in circumstances such as those presented to the court. Any doubt that might remain is resolved by Paragraph 10 of the Living Will where A.A. stated, "in the event my wishes are not clear or a situation arises I did not anticipate my Medical Decision Attorney–In–Fact is authorized to make decisions based upon what he or she know of my wishes." Therefore, once a determination of A.A.'s incapacity was made pursuant to *N.J.S.A.* 26:2H.60(a), the directive would become operative.

Here the court received a certification from A.A.'s treating psychiatrist, Jessica Berlet, M.D. Dr. Berlet states that "A.A. is severely depressed, suffers from visual and auditory hallucina-

tions, is in a hopeless state and does not believe that any treatment will be of any benefit for her." She contends that as a result of the illness, A.A. cannot participate in the decision-making process and therefore, ECT is the treatment of choice for A.A. Dr. Berlet believes that ECT will improve A.A.'s depression, make her more hopeful and give her a more logical thought process, which would allow her to participate in the decision-making involving her future care. The applicant also submitted a certification from David Greenspan, M.D., who confirmed that A.A. lacks the capacity for medical decision-making. He maintains that she suffers from major depression, severe, with psychotic features and that her mental conditions and health have declined rapidly in the past few weeks. Without ECT, he believed that her condition would continue to worsen and she would never regain the ability to participate in her medical decision-making. These two physicians' opinions satisfy the statutory requirement that the patient lacks decision-making capacity. Additionally, the document meets the procedural requirements of the act in that it was signed, dated and notarized.

Moreover *N.J.S.A.* 26:2H–60 (e) requires the attending physician inform the patient if there is any ability to comprehend that there has been a determination of lack of capacity. Dr. Berlet attempted to inform A.A. of this determination. However, she did not appear to comprehend what was said.

Given all of the information discussed herein, it is this court's finding that the advance directive designating C.M. as decision-maker is operative for purposes of a decision to administer ECT. All of the technical requirements of the Advanced Directives for Health Care Act have been met. Moreover, it appears that A.A.'s family members, most significantly C.M. and her physicians and lawyer, believe this to be the appropriate course of action for her.

Therefore, it is this court's opinion that in circumstances such as those presented to the court by A.A.'s situation, the formal procedures normally mandated prior to the administration of ECT without consent are unnecessary. A prior authorization that falls

within the parameters of the Advance Directives for Health Care Act will serve as a substitute for the patient's consent at the time the ECT is administered when all of the act's requirements have been met.